| PETER ADAMS, ET AL | * | NO. 2025-CA-0444 |
| VERSUS | * | |
| | | COURT OF APPEAL |
| ENTERGY NEW ORLEANS, | * | |
| INC. ENTERGY LOUISIANA, | | FOURTH CIRCUIT |
| L.L.C. AND SEWERAGE AND | * | |
| WATER BOARD OF NEW | | STATE OF LOUISIANA |
| ORLEANS | * * * * * * * | |

**CONSOLIDATED WITH:**

**CONSOLIDATED WITH:**

PETER ADAMS, ET AL

NO. 2025-CA-0611

VERSUS

ENTERGY NEW ORLEANS, INC.,
ENTERGY LOUISIANA, L.L.C.
AND SEWERAGE AND WATER
BOARD OF NEW ORLEANS

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2015-09035, DIVISION "J"
Honorable D. Nicole Sheppard
* * * * * *
**Judge Nakisha Ervin-Knott**
* * * * * *

(Court composed of Judge Rosemary Ledet, Judge Dale N. Atkins, Judge Nakisha Ervin-Knott)

Darleen M. Jacobs
Hunter Harris
Rene D. Lovelace
THE LAW OFFICES OF DARLENE M JACOBS
823 St. Louis Street
New Orleans, LA 70112-3415

        COUNSEL FOR PLAINTIFFS/APPELLEES


Kim M. Boyle
Allen C. Miller
Ashley J. Heilprin
Stephanie M. Poucher
PHELPS DUNBAR LLP
365 Canal Street, Suite 2000

New Orleans, LA 70130

COUNSEL FOR DEFENDANT/APPELLANT

**REVERSED AND RENDERED**
**MARCH 10, 2026**

NEK
RML
DNA

Defendant-Appellant, Entergy New Orleans, LLC ("Entergy"), appeals the trial court's March 31, 2025 and July 2, 2025 judgments rendered in favor of Plaintiffs-Appellees, Peter Adams, et al.[1] (collectively, "Plaintiffs"). The trial court found Entergy liable for negligence following a natural gas leak on October 10, 2014, and awarded general damages for alleged personal injuries. For the reasons that follow, we reverse the trial court's judgments in favor of Plaintiffs and render judgment in favor of Entergy dismissing Plaintiffs' claims with prejudice.

**FACTUAL AND PROCEDURAL HISTORY**

On September 16, 2014, Entergy was performing a gas leak detection patrol and identified a potential natural gas leak in the 1700 block of Painters Street, in New Orleans, Louisiana. An Entergy repair crew was dispatched to the area and pinpointed a cracked two-inch PE high volume cap on the main natural gas line. The repair crew replaced the cracked cap that same day.

In a nearby area, on October 3, 2014, a drunk driver collided with an 18-wheeler loaded with gasoline triggering a fire to erupt in the cab of the 18-wheeler. According to New Orleans Fire Department Captain Michael Calamari ("Captain

---

[1] There are over 100 individuals listed as Plaintiffs in this lawsuit.

1

Calamari"), the fire melted the 18-wheeler's aluminum tank trailer causing gasoline to spill onto the street and into storm drains and grass along the side of the road, and fumes and smoke from the fire to move into the neighborhood. The tanker explosion was so severe that the driver of the 18-wheeler succumbed to injuries sustained in the fire.

On October 10, 2014, exactly one week after the tanker explosion – another natural gas leak was reported at the intersection of Painters Street and North Derbigny Street, which is just one block away from the location of the tanker explosion. Upon investigation, Entergy technicians identified a leak in a plastic gas main. The failure was subsequently attributed to a failure in the two-inch sidewall T fusion in the main gas line. Entergy personnel repaired the natural gas leak on the same day it was reported.

Plaintiffs, who were residents of the neighborhood where the October 10, 2014 gas leak occurred, filed a claim for damages on September 18, 2015, and a first supplemental and amending petition on September 22, 2015. Entergy New Orleans, Inc., Entergy Louisiana, L.L.C., and Sewerage and Water Board of New Orleans were named as Defendants. Plaintiffs alleged that the leaking natural gas caused them to suffer a variety of symptoms, including headaches, nausea, dizziness, and aggravation of pre-existing lung, asthma, and sinus conditions. Plaintiffs contended that Entergy was negligent in its maintenance and inspection of the gas line.

A bench trial was conducted between May 6, 2024, and August 26, 2024. At trial, seventy-nine Plaintiffs testified regarding their personal experiences during the October 10, 2014 natural gas leak, specifically describing the smell of natural gas in the air throughout the neighborhood and the physical symptoms they attributed to the natural gas exposure. Plaintiffs' testimony included reports of headaches,

2

congestion, runny noses, abdominal cramping, diarrhea, and asthma (or asthma exacerbations). Additionally, Plaintiffs' certified medical records related to their purported injuries were admitted into evidence. Notably, Plaintiffs did not present any expert testimony regarding medical causation.

On the other hand, Entergy presented the expert testimony of Dr. Christopher Spaeth ("Dr. Spaeth"), a toxicologist, to opine on the effects of natural gas exposure to human health. Additionally, Entergy's gas engineering superior, Stephen Mirambell ("Mr. Mirambell") and Entergy employee, Daniel Murray ("Mr. Murray") testified about the September 16, 2014 and October 10, 2014 incidents and Entergy standard protocol. Entergy work reporting forms and DIMP leak forms from the September 16, 2014 and October 10, 2014 incidents were also admitted into evidence.

At the conclusion of trial, the trial court took the matter under advisement. On March 31, 2025, the trial court rendered judgment in favor of the Plaintiffs finding "through several hours of the [P]laintiff's testimony, it is evident that the symptoms were caused or aggravated by the [n]atural [g]as leak." The court awarded general damages to each Plaintiff in various amounts ranging from $0 - $5,000.00.

On April 17, 2025, Entergy filed a petition for suspensive appeal, and the order granting the appeal was signed on April 28, 2025. Two Plaintiffs were not included in the March 31, 2025 judgment; therefore, on July 2, 2025, the trial court issued a subsequent judgment to include these two Plaintiffs. Again, on July 11, 2025, Entergy filed a petition of suspensive appeal regarding the July 2, 2025 judgment, and the order granting the appeal was signed on July 11, 2025. On October 1, 2025, Entergy filed an unopposed motion to consolidate with this Court, and we

3

issued an order consolidating the two appeals on the next day. This timely consolidated appeal follows.

## STANDARD OF REVIEW

"A trial court's factual determinations made after a bench trial are reviewed with the manifest error/clearly wrong standard of review." *Reaver v. Degas House, LLC*, 2022-0464, p. 3 (La. App. 4 Cir. 3/13/23), 359 So. 3d 570, 573 (citing *Hall v. Folger Coffee Co.*, 2003-1734, p. 9 (La. 4/14/04), 874 So. 2d 90, 98). "This standard 'precludes the setting aside of a district court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety.'" *Id.*

Conversely, "[l]egal questions are reviewed utilizing the *de novo* standard of review." *Id.* at p. 3, 359 So. 3d at 574 (quoting *Robert v. Robert Mgmt. Co., LLC*, 2011-0406, p. 3 (La. App. 4 Cir. 12/7/11), 82 So. 3d 396, 398).

## DISCUSSION

On appeal, Entergy asserts three assignments of error – (1) Plaintiffs failed to establish Entergy's liability under Civil Code articles 2315, 2317, and 2317.1; (2) Plaintiffs failed to meet their burden of demonstrating that the October 10, 2014 natural gas leak caused their injuries; and (3) Plaintiffs failed to establish their entitlement to the general damages the trial court awarded, such that assuming that Entergy was liable, the damages awarded must be drastically reduced.

4

First, Entergy contends the trial court erred in finding it liable under La. C.C. arts. 2315[2], 2317[3], and 2317.1[4]. Specifically, Entergy asserts that the trial court manifestly erred in presumably finding that it had actual or constructive knowledge of the conditions that caused the October 10, 2014 natural gas leak and that it could have prevented the leak through the exercise of reasonable care.

This Court previously observed:

> [T]he Louisiana Supreme Court recently expounded that "[w]hether a claim arises in negligence under [La. C.C.] art. 2315 or in premises liability under [La. C.C.] art. 2317.1, the traditional duty/risk analysis is the same." *Farrell v. Circle K Stores, Inc.*, [20]22-00849, p. 5 (La. 3/17/23), 359 So. 3d 467, 473. "And now, with [La. C.C.] art. 2317.1's requirement of actual or constructive knowledge of a defect, the result under either should be the same." *Id.* "In any event, a claim under [La. C.C.] art. 2315 typically focuses on whether the defendant's conduct of allowing an unreasonably dangerous condition to exist on its premises is negligent, while a [La. C.C.] art. 2317.1 claim focuses on whether the thing itself is defective; *i.e.*, unreasonably dangerous." *Id.* "But, when the legislature eliminated strict liability for defective things in one's custody by adding [La. C.C.] art. 2317.1, a negligence standard replaced it." *Id.* "The requirements of actual or constructive knowledge of the defect and proof that the defendant could have prevented damage from the defect by exercising reasonable care evidences this shift." *Id.* (citing *Malta v. Herbert S. Hiller Corp.*, [20]21-209, p.11 (La. 12/10/21), 333 So. 3d 384, 395).

---

[2] Louisiana Civil Code Article 2315 provides, in pertinent part, "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

[3] Louisiana Civil Code Article 2317 provides, "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications."

[4] Louisiana Civil Code Article 2317.1 provides:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

*Williams v. Touro Infirmary*, 2023-0180, pp. 9-10 (La. App. 4 Cir. 12/20/23), 382 So. 3d 345, 352-353. A plaintiff seeking to recover damages under La. C.C. arts. 2317 and 2317.1 must prove that:

> (1) [T]he thing was in the [owner or] custodian's custody or control; (2) it had a vice or defect that presented an unreasonable risk of harm; (3) the defendant knew or should have known of the unreasonable risk of harm; and (4) the damage was caused by the defect.

*Fisher v. Villere*, 2020-0242, p. 9 (La. App. 4 Cir. 2/24/21), 313 So. 3d 1282, 1289 (citation omitted). "Failure of the plaintiff to prove any one of the above factors is fatal to the case." *Id.*

Constructive notice has been defined as "the existence of facts which infer actual knowledge." *Russell v. Forest Isle, Inc.*, 2018-0602, p. 5 (La. App. 4 Cir. 12/5/18), 261 So. 3d 47, 50 (citations omitted). "Constructive notice can be found if the conditions which caused the injury existed for such a period of time that those responsible, by the exercise of ordinary care and diligence, must have known of their existence in general and could have guarded the public from injury." *Id.* "The concept of constructive knowledge imposes a reasonable duty to discover apparent defects in things under the defendant's garde." *Lotridge v. Abril,* 2007-1401, p. 5 (La. App. 4 Cir. 12/30/08), 3 So. 3d 84, 88 (citation omitted).

In this case, the record is devoid of evidence that Entergy had actual or constructive notice of the T fusion failure prior to the October 10, 2014 natural gas leak. During trial, Mr. Mirambell testified about both the September 16, 2014 and October 10, 2014 natural gas leak incidents and explained how the two incidents were unrelated. According to Mr. Mirambell, the September 16, 2014 natural gas leak was caused by a cracked two-inch PE high volume cap. He testified that the repair crew replaced the leaking cap as soon as it was discovered to be the source of

6

the leak, and the Entergy work reporting form for that day stated "job complete", meaning there was no longer a gas leak in that area. Mr. Murray corroborated his testimony and expounded on the fact that Entergy had repaired the cap issue on September 16, 2014. Mr. Murray testified that the gas leak was remedied prior to marking the job as complete. While the September 16, 2014 natural gas leak was due to a cracked cap, Mr. Mirambell explained that the October 10, 2014 natural gas leak was caused by a defective T fusion. He further testified that the September 16, 2014 incident had no effect on the October 10, 2014 incident.

Plaintiffs failed to rebut Messrs. Mirambell and Murray's testimonies, Entergy work reporting forms, and DIMP leak forms with any evidence demonstrating that the September 16, 2014 incident should have put Entergy on notice of the defective T fusion that caused the October 10, 2014 incident. In their petition, Plaintiffs alleged that Entergy was "notified of repeated gas leaks near the intersection of Painters and N. Derbigny Streets…but failed to replace pipelines in that area . . .." However, the only person who testified to having called Entergy to report any leak was Plaintiff, Ms. Diane Patterson ("Ms. Patterson"). Significantly, Ms. Patterson testified that she called Entergy on October 10, 2014. The Entergy work reporting form and DIMP leak form were dated October 10, 2014, which meant that Entergy came out to the location and repaired the natural gas leak on October 10, 2014. Ms. Patterson's testimony, together with the October 10, 2014 work reporting form and DIMP leak form, establishes that Entergy repaired the leak on the same day it was reported.

An examination of the record reveals that Plaintiffs did not put forth any evidence that Entergy had prior notice of the natural gas leak. Due to Plaintiffs' failure to prove the essential element of actual or constructive notice, the trial court's

7

determination of negligence was manifestly erroneous. Therefore, Entergy's first assignment of error has merit.

Second, Entergy maintains that Plaintiffs failed to meet their burden of demonstrating that the October 10, 2014 natural gas leak caused their injuries. Entergy maintains the position that Plaintiffs were required to show causation – that the October 10, 2014 natural gas leak caused their purported injuries – and failed to do so.

"In a personal injury suit, plaintiff bears the burden of proving a causal relationship between the injury sustained and the accident which caused the injury." *Maranto v. Goodyear Tire & Rubber Co.*, 1994-2603, p. 3 (La. 2/20/95), 650 So. 2d 757, 759 (citation omitted). "In toxic tort cases, proof of causation has two components: general and specific." *Lataxes v. Louisiana Home Specialists, LLC*, 2024-129, p. 10 (La. App. 5 Cir. 12/30/24), 409 So. 3d 1010, 1017 (citation omitted). "'General causation' refers to whether a substance is capable of causing a particular injury or condition in the general population, while 'specific causation' refers to whether a substance caused a particular individual's injury." *Id*. (citation omitted). "A plaintiff cannot sustain his or his burden of proof with general causation proof alone; the plaintiff must also establish specific causation." *Id*. (citation omitted).

As it relates to expert testimony, "[w]hen a conclusion regarding medical causation is not one within common knowledge, expert medical testimony is required in a tort action." *Johnson v. E.I. DuPont deNemours & Co.,* 2008-628 (La. App. 5 Cir. 1/13/09), 7 So. 3d 734, 740 (citation omitted). Significantly, "[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the

8

plaintiffs' burden in a toxic tort case." *Allen v. Penn. Eng'g Corp.,* 102 F.3d 194, 199 (5th Cir. 1996) (citation omitted); *see also Smith v. BP Expl. & Prod., Inc.*, No. 2023-30619, 2024 WL 3842571, at *2 (5th Cir. Aug. 16, 2024) (unpublished) (citation omitted) ("In toxic tort cases, expert evidence on 'knowledge of the harmful level of exposure to a chemical,' or general causation, is a 'minimal fact necessary to sustain the plaintiffs' burden'").

In this present matter, Plaintiffs bore the burden of establishing that the October 10, 2014 natural gas leak caused their alleged injuries. Seventy-nine Plaintiffs testified regarding their personal experiences during the October 10, 2014 natural gas leak, specifically describing the smell of natural gas in the air throughout the neighborhood and the physical symptoms they attributed to the natural gas exposure. Plaintiffs' testimony included reports of headaches, congestion, runny noses, abdominal cramping, diarrhea, and asthma (or asthma exacerbations). However, at trial, Plaintiffs failed to present any expert testimony to establish medical causation. The lack of expert testimony is fatal to Plaintiffs' case.

Plaintiffs attempt to circumvent their lack of an expert by relying on the *Housley* presumption. However, this reliance is misplaced. "A plaintiff may be assisted in meeting his burden of proof that an injury is causally related to an accident by a legal presumption that was articulated by the Louisiana Supreme Court in *Housley v. Cerise,* 579 So.2d 973 (La.1991)." *Kelly v. AME Janitorial Services Co.*, 2009-1167, p. 3 (La. App. 4 Cir. 3/3/10), 33 So. 3d 358, 360. Citing *Housley*, this Court explained:

> A claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing

9

that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.

*Id.* (citation omitted). A plaintiff must establish the following three elements by a preponderance of the evidence in order to benefit from the *Housley* presumption:

First, the plaintiff must prove that he was in good health prior to the accident allegedly causing the plaintiff's injury. Second, the plaintiff must show that subsequent to the accident, symptoms of the alleged injury appeared and continuously manifested themselves after the accident. Third, the plaintiff must demonstrate through medical evidence, circumstantial evidence, or common knowledge that there was a reasonable possibility of causation between the accident and the alleged injury.

*Id.* at p. 4, 33 So. 3d at 360.

Plaintiffs have not presented sufficient evidence to establish by a preponderance of the evidence that their alleged medical issues were more probable than not caused by their exposure to natural gas during the October 10, 2014 incident. None of Plaintiffs' certified medical records attributed their illnesses to natural gas exposure, and their treating physicians did not link their symptoms to natural gas exposure. Also, while the incident that forms the basis of this case occurred on October 10, 2014, one Plaintiff began receiving medical treatment on October 9, 2014 – the day before the October 10, 2014 gas leak – and another plaintiff did not seek medical care until three months after the October 10, 2014 incident on January 12, 2015.

Moreover, the circumstantial evidence would tend to support a finding that the October 3, 2014 tanker explosion – not the October 10, 2014 natural gas leak – caused Plaintiffs' medical issues, as the certified medical records showed that seventeen Plaintiffs attributed their symptoms to the October 3, 2014 tanker explosion and not the October 10, 2014 gas leak. Additionally, Captain Calamari

10

testified about the severity of the October 3, 2014 tanker explosion, specifically discussing the lingering presence of gasoline in the air and the effects of the fire.

Lastly, Louisiana jurisprudence recognizes that common knowledge is inapplicable in the toxic tort context. *E.I. DuPont deNemours & Co.*, 2008-628, p. 8, 7 So. 3d at 740 ("[W]hether or not plaintiffs suffered injuries as a result of chemical exposure…is not a determination based on common knowledge, so the plaintiffs were required to present expert medical testimony in order to meet their burden of proving medical causation"). Plaintiffs' inability to prove by a preponderance of the evidence the three essential elements does not entitle them to the *Housley* presumption.

At trial, Entergy presented unrefuted expert testimony from Dr. Spaeth who explained that natural gas, and its odorant, methyl mercaptan, are incapable of causing Plaintiffs' alleged injuries. Dr. Spaeth testified that in an outdoor, open-air environment, natural gas dissipates rapidly and does not pose a risk to human health, and only when a person is exposed to an extremely high concentration of natural gas can they suffer two possible health risks that natural gas poses – asphyxiation and hypoxia. Further, Dr. Spaeth opined that even high exposure levels to natural gases cannot cause the types of medical issues that Plaintiffs experienced, such as nasal drip, burning eyes, diarrhea, bronchitis, nausea, shortness of breath, headaches, and asthma. Importantly, Dr. Spaeth provided the following expert testimony:

> Q: There was approximately 112,200 cubic feet of gas released into the air at a rate of 5,000 feet per second as a result of the natural gas leak on October 10th, 2014; correct?
>
> A: That is correct.
>
> Q: In an open-air environment, is that amount of natural gas toxic?

A: No, that amount of natural gas would not be expected to cause any toxicity.

Q: Okay. Is that enough natural gas [to] decrease the amount of breathable oxygen?

A: No. That amount of natural gas would not decrease the breathable oxygen in the area because of how quickly the natural gas disperses and how light it is compared to ambient air.

….

Q: Okay. Now, is it possible in an open space, as we have in this case, to have a high enough concentration of natural gas to pose a risk of hypoxia?

A: So natural gas dissipates almost instantaneously in the open air, so, no, there's — you know, there's no possibility that it would reach these types of concentrations in open air for somebody to asphyxiate or show signs of hypoxia.

….

Q: Under any scenario, given the amount of gas that was released in an open area, under any scenario, could that amount of gas have been harmful to humans?

A: So since the — since we know that natural gas disperses infinitely and almost instantaneously in open air, there wouldn't be enough natural gas that was released that would cause an injury in open air or any type of toxicity in open air.

Q: Could enough mercaptan have escaped sufficient to cause any injury to humans?

A: No. Based on the toxicology studies on mercaptan and how much mercaptan was added to the line, we know that the mercaptan that escaped would not have been causal with any injuries as a result.

Dr. Spaeth's testimony was clear – Plaintiffs were not exposed to sufficiently high concentrations of natural gas on October 10, 2014, to cause asphyxiation, hypoxia, or any of their alleged illnesses.

In an attempt to produce evidence of medical causation, Plaintiffs isolate a portion of Dr. Spaeth's testimony on cross-examination regarding methyl mercaptan to advance the argument that their illnesses were caused by exposure to mercaptan:

Q: Your report states that gas would not remain in the area once the leak stopped. However, you also state that residual odor may remain in the area where the leak occurred; is that correct?

A: That is correct. Yes

Q: Can you tell us how long the residual odor lasted in the area where the leak occurred?

A: So to — I'm unable to tell you that as a result of — now, we haven't — there's a number of different factors that would affect dispersion of a gas that's heavier than ambient air. So methyl mercaptan is heavier than ambient air and would exhibit different dispersion properties than natural gas, which would quickly disperse. However, mercaptan would settle down onto the street level and could be around for quite a while.

And I'd also like to point out that the odor threshold for mercaptan is incredibly low. So it's super easy to smell, even at low concentrations. So —

Q: Isn't it a —

A: — the duration of time that it was — I'm sorry. I'm sorry. I'm getting there. The duration of time that it would be there could have been a while given the buildings and the other things that were around, but it didn't necessarily indicate natural gas at that point.

Q: Doesn't mercaptan have side effects?

A: So absolutely. There is a toxicological assessment that's been performed on methyl mercaptan, and there are definite known toxic effects from methyl mercaptan exposure.

Q: And if mercaptan was in the area because it odorized the gas and someone breathed it, they could be affected; is that correct?

A: So that is incorrect. And what you're — what you're doing is what's called a hazard assessment. So, yes, the mercaptan can cause some injuries; however, it's also dependent upon the dose and the exposure.

We know, based on data and the U.S. Code of Federal Regulations, that a certain amount of mercaptan was added to that line. And we know that it's 8 ppm. That level is sufficiently below the safety threshold that even in a leak like this, the mercaptan would never achieve a high enough concentration to produce toxicity. And that is done on purpose to prevent methyl mercaptan toxicity.

Dr. Spaeth's testimony concedes that there are known toxic effects from mercaptan exposure. However, he unequivocally opines that, given the nature of the October 10, 2014 gas leak, the mercaptan levels in the gas line were far too low to cause any illness. Therefore, while Plaintiffs may seek to use Dr. Spaeth's testimony to bolster their causation argument, his testimony actually supports Entergy's position that there is no causal relationship between the October 10, 2014 incident and Plaintiffs' alleged injuries.

It is evident from the record that Plaintiffs failed to present any expert testimony necessary to prove that natural gas exposure causes the particular injuries Plaintiffs purportedly suffered. Without this necessary evidence, Plaintiffs were unable to establish general causation. Ultimately, Plaintiffs' inability to establish general causation rendered them incapable of proving causation, an essential element of any negligence case. The trial court clearly erred in its determination that the October 10, 2014 natural gas leak was the cause of Plaintiffs' alleged injuries. Accordingly, because Plaintiffs have failed to prove causation in this matter, Entergy's second assignment of error also has merit. Given the fact the Plaintiffs failed prove the requisite elements of actual or constructive notice and causation, reversal of the trial court's liability determination is required.

Given our above-referenced analysis regarding Entergy's first two assignments of error and finding that Entergy is not liable to Plaintiffs for their alleged injuries, we pretermit our discussion of the last assignment of error concerning the damage awards as this issue is moot.

**DECREE**

For the foregoing reasons, we reverse the trial court's March 31, 2025 and July 2, 2025 judgments in favor of Plaintiffs and render judgment in favor of Entergy dismissing Plaintiffs' claims with prejudice.

**REVERSED AND RENDERED**